**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

BARD MANUFACTURING CO.

                  Plaintiff,

v.

EUBANK MANUFACTURING
ENTERPRISES, INC.

                  Defendant.

Civil Action No.: 3:00CV7711

Judge David A. Katz

**ANSWER TO
COUNTERCLAIM**

Now comes Plaintiff, BARD MANUFACTURING CO. (hereinafter "Bard"), by and through its Attorneys, Baniak Pine & Gannon, and answers and otherwise responds to the Counterclaim of Defendant, EUBANK MANUFACTURING ENTERPRISES, INC. (hereinafter "Eubank" or "Defendant"), as follows:

**<u>COUNTERCLAIMS</u>**

1.      Defendant/Counterclaimant Eubank Manufacturing Enterprises, Inc. (Eubank) is a corporation organized and existing under the laws of the State of Texas, having a place of business at Farm Market Road 2011, Longview, Texas 75607.

**<u>ANSWER:</u>**

Bard admits the allegations contained within this paragraph on information and belief.

2.      Plaintiff/Counterdefendant Bard Manufacturing Company (Bard) has asserted that it is a corporation organized and existing under the laws of the State of Ohio, having its principal place of business at 1914 Randolph Drive, Bryan, Ohio 43506-2254.

**ANSWER:**

Bard admits the allegations contained within this paragraph.

3.      Bard has submitted to the jurisdiction and venue of this Court.

**ANSWER:**

Bard admits the allegations contained within this paragraph.

## FACTS COMMON TO ALL COUNTERCLAIMS

### *Sun Air Conditioning, Inc.*

4.      Sun Air Conditioning, Inc. ("Sun") is a manufacturer of heating, ventilation, and air-conditioning (HVAC) products with its principal place of business in Vienna, Georgia.

**ANSWER:**

Bard admits the allegations contained within this paragraph on information and belief.

5.      Beginning in early 1991, Sun embarked on a redesign of its vertical wall mounted air conditioning systems so that the system would have a removably fastenable ventilation module in a chamber within the vertical housing of the air-conditioning units.  This would allow the units to have an "economizer" placed in the chamber if so requested by the customer.

**ANSWER:**

Denied on information and belief.

6.      Prior to September of 1991, the redesign project was complete, and working models of the new vertical air-conditioner unit were completed.  The units were given an "AV" designation.  If the unit contained an economizer module, it was given the "AVE" designation

for "air-conditioner vertical economizer."  If it was a heat pump, it was given the "HVE"

designation for "heat pump vertical economizer."

**ANSWER:**

Bard is without knowledge or information sufficient to form a belief as to the truth of the

allegations contained within this paragraph, and therefore denies the same.

7.     The Sun AVE unit that was in existence on September 5, 1991 meets all of the

claim limitations of at least each of the independent claims of the '744 Patent and the '878

Patent.

**ANSWER:**

Bard is without knowledge or information sufficient to form a belief as to "[t]he Sun

AVE unit that was in existence on September 5, 1991," and therefore denies the same.  Bard

denies that any Sun AVE unit meets all of the claim limitations of at least each of the

independent claims of the patents in suit.

8.     On or about September 5, 1991 representatives of Bard, including, in particular

James R. Bard, President of Bard, visited the Sun facility in Vienna, Georgia, under the pretext

of determining if Sun would be a capable manufacturer for Bard products in the future.

**ANSWER:**

Bard admits that it visited the Sun facility in Vienna, Georgia; Bard denies the remaining

allegations contained within this paragraph.

9.     During the visit at the Sun facility, James R. Bard viewed the Sun AVE unit that

meets all of the claim limitations of at least each of the independent claims of the '744 Patent and

the '878 Patent, including the modular economizer unit that fits into and is removably fastened to

the chamber.

**ANSWER:**

Denied.

10.     During the visit at the Sun facility, James R. Bard asked questions concerning the modular economizer; specifically, he inquired about the module's fit into the unit and the process for removing the module from the Sun AVE unit.  Sun representatives disclosed the information requested by James Bard.

**ANSWER:**

Denied.

11.     After a reasonable opportunity for further investigation or discovery, Eubank believes there will be evidence that prior to the visit to the Sun facility on or about September 5, 1991, Bard had been unable to manufacture and sell a vertical wall unit that would have met the claim limitations of the '744 Patent or '878 Patent.

**ANSWER:**

Denied.

12.     On November 6, 1991, Underwriters Laboratories, Inc. gave Sun authorization to apply the UL Listing Mark to its new AVE units.

**ANSWER:**

Bard is without knowledge or information sufficient to form a belief as to the truth of the allegations contained within this paragraph, and therefore denies the same.

13.     On November 26, 1991, Sun shipped approximately 16 AVE units to Fibrebond Corporation in Minden, Louisiana.  Each of the units was sold for $1,412.00.  This sale of the Sun AVE units was more than one year before the applications for either the '744 Patent or the '878 Patent were filed in the United States Patent and Trademark Office.

**ANSWER:**

Bard is without knowledge or information sufficient to form a belief as to the truth of the allegations contained within this paragraph, and therefore denies the same.

### *Prosecution of the '744 Patent and the '878 Patent*

14.     The inventor listed on the '744 Patent and the '878 Patent is Irvin L. Derks of Bryan, Ohio.  Mr. Derks was Bard's Vice President of Engineering and was in charge of the Bard redesign of its wall mounted HVAC units.  In that capacity, he reported either directly or indirectly to James R. Bard.

**ANSWER:**

Bard admits the allegations contained within this paragraph.

15.     After a reasonable opportunity for further investigation or discovery, Eubank believes there will be evidence that only after James R. Bard saw the Sun AVE units, did Bard finish the redesign of its units, which it introduced in June of 1992, more than six months after Sun shipped its AVE units.

**ANSWER:**

Denied.

16.     On or about December 31, 1992, James R. Bard substantively participated in the prosecution of the '744 Patent by signing a verified statement claiming small entity status that evidenced his approval of the filing of the patent application that would become the '744 Patent, despite knowing that Sun had known and used the invention described in the patent application more than a year before December 31, 1992.

**ANSWER:**

Bard admits that James R. Bard signed a verified statement claiming small entity status; Bard denies the remaining allegations contained within this paragraph.

17.    On or about December 31, 1992, James R. Bard substantively participated in the prosecution of the '744 Patent by signing a verified statement claiming small entity status, stating in part that rights under contract or law have been conveyed to and remain with Bard with regard to the invention described in the application that would become the '744 Patent, despite knowing that Sun had known and used the invention described in the patent application more than one year before December 31, 1992.

**ANSWER:**

Bard admits that James R. Bard signed a verified statement claiming small entity status; Bard denies the remaining allegations contained within this paragraph.

18.    On or about February 5, 1993, Bard, through its attorney, filed the patent application containing James R. Bard's signed verified statement with the United States Patent and Trademark Office, despite knowing that Sun had known and used the invention described in the patent application more than one year before February 5, 1993.

**ANSWER:**

Bard admits that the patent application was filed on or about February 5, 1993; Bard denies the remaining allegations contained within this paragraph.

19.    On or about February 5, 1993, Bard, through its attorney, filed the patent application containing James R. Bard's signed verified statement with the United States Patent and Trademark Office, despite knowing that the application did not refer to or disclose the Sun

AVE product that James R. Bard had seen during his visit to Sun in September of 1991, even though it was relevant and material prior art.

**ANSWER:**

Bard admits that the patent application was filed on or about February 5, 1993; Bard denies the remaining allegations contained within this paragraph.

20.     On or about January 29, 1993, Irvin L. Derks signed a declaration and power of attorney declaring that he was the original, first and sole inventor of the invention claimed in the patent application.

**ANSWER:**

Bard admits the allegations contained within this paragraph.

21.     After a reasonable opportunity for further investigation or discovery, Eubank believes there will be evidence that Irvin L. Derks knew that Sun had known and used (at least as early as September, 1991) the invention described in the patent application.

**ANSWER:**

Denied.

22.     On or about February 5, 1993, Bard, acting through its attorney, filed the patent application containing Irvin L. Derks' declaration and power of attorney with the United States Patent and Trademark Office, despite knowing that Sun had known and used the invention described in the patent application more than one year before February 5, 1992.

**ANSWER:**

Bard admits that the patent application was filed on about February 5, 1993; Bard denies the remaining allegations contained within this paragraph.

23.     On or about February 5, 1993, Bard, acting through its attorney, filed the patent application containing Irvin L. Derks' declaration and power of attorney with the United States Patent and Trademark Office, despite knowing that the application did not refer to or disclose the Sun AVE product that James R. Bard had seen during his visit to Sun in September of 1991, even though it was relevant and material prior art.

**ANSWER:**

Bard admits that the patent application was filed on or about February 5, 1993; Bard denies the remaining allegations contained within this paragraph.

24.     On or about March 23, 1994, Bard, acting through its attorney, filed an application as a continuation-in-part of the '744 Patent.  This application had claims that were similar to those claimed in the patent application that ultimately issued as the '744 Patent.  The '878 Patent ultimately issued after Bard and Derks disclaimed the portion of the term subsequent to the expiration of the '744 Patent.

**ANSWER:**

Bard generally admits the allegations contained within this paragraph; however, Bard (not Derks) disclaimed the portion of the term of the '878 Patent subsequent to the expiration of the '744 Patent.

25.     At no time did Bard inform the United States Patent and Trademark Office about the Sun AVE unit that James R. Bard saw in September of 1991.

**ANSWER:**

Without further information as to "the Sun AVE unit" referenced above, this allegation is incomprehensible and, therefore, denied.

26.     On or about April 12, 1994, the '744 Patent was issued by the United States Patent and Trademark Office.  On or about January 23, 1996, the '878 Patent was issued by the United States Patent and Trademark Office.  Both patents list Irvin L. Derks as the sole inventor, and both patents list Bard as the assignee.

**ANSWER:**

Bard admits the allegations contained within this paragraph.

### *The Crispaire Litigation*

27.     In 1995, Bard filed a patent infringement action to enforce the '744 Patent and the '878 Patent against Crispaire Corporation ("Crispaire"), even though it knew that the patent infringement lawsuit was objectively baseless when filed because Bard's patents were fraudulently obtained, invalid and/or unenforceable.  That case, civil action number 3:95CV7103, was filed in the United States District Court for the Northern District of Ohio, Western Division.

**ANSWER:**

Bard admits that it filed a patent infringement action to enforce the '744 Patent and (later) the '878 Patent against Crispaire Corporation, and that the action, Civil Action Number 3:95CV7103, was filed in the United States District Court for the Northern District of Ohio, Western Division; Bard denies the remaining allegations contained within this paragraph.

28.     After a reasonable opportunity for further investigation or discovery, Eubank believes there will be evidence that Bard brought the patent infringement lawsuit against Crispaire with full knowledge of the willful fraud it used to obtain the '744 Patent and the '878 Patent.

**ANSWER:**

Denied.

29.     In the Crispaire litigation, the district court was not presented with evidence of Jim and Richard Bard's trip to Sun Manufacturing in September, 1991.  Nor was it presented with evidence regarding whether the 1991 Sun AVE unit contained all the claimed elements of the '744 Patent and '878 Patent and, as such, constituted invalidating prior art.

**ANSWER:**

Bard admits that Crispaire ultimately relied on its own pre-1993 unit as prior art, just as Eubank (now a sister company to Sun, and both owned by Fedders) now relies on its own company's pre-1993 unit as prior art.  Without an extensive review of six years of litigation files, Bard is currently without knowledge or information sufficient to form a belief as to whether Crispaire ever referred to or relied on any Sun unit, given that many devices were raised by Crispaire as possible prior art during the course of that litigation, and therefore denies the above.

30.     Eubank believes that only because this evidence was not presented was Bard successful in its action against Crispaire, obtaining an injunction to prevent Crispaire from selling certain of its wall mounted HVAC units and obtaining a damage award.

**ANSWER:**

Denied.

31.     In the Crispaire litigation, Bard conceded that, in order to fully compete in the wall mounted HVAC unit market, a manufacturer needs a complete product line of wall mounted HVAC units.  As a result of Bard's suit, Crispaire cannot sell a full line of wall mounted HVAC units and Crispaire's ability to compete in the wall mounted HVAC unit market has been adversely impacted.

**ANSWER:**

Denied.

### *Relevant Markets and Bard's Monopoly Power*

32.     The '744 Patent and the '878 Patent describe a modular air conditioning/HVAC system which is capable of receiving interchangeable ventilation modules having varying degrees of air mixing abilities.  The patents further describe these units as attaching to a structure and having an elongated housing.  The units being described are commonly referred to as wall mounted units.

**ANSWER:**

To the extent that Bard understands Defendant's characterization of the patents in suit, Bard generally admits that the patents set forth in their specifications what the allegations contained within this paragraph state, among other things; however, not all claims require interchangeable ventilation modules.

33.     The use of interchangeable ventilation modules allows the manufacturer to use a standard wall mounted model into which it can place an economizer, barometric damper, or some other form of ventilation control either at the time of manufacture or after the unit has been installed.

**ANSWER:**

Bard admits in part and denies in part the allegations contained within this paragraph. Defendant misapprehends "interchangeable" and misconstrues "ventilation module."  It is unknown what Defendant means by "standard wall mounted model."  In addition, the patents in suit offer many advantages, from assembly line to distributor to use in the field; installation of

the ventilation module is not limited to "the time of manufacture or after the unit has been installed."

34.     In the Crispaire litigation, Bard conceded that the relevant product market is no broader than the manufacture and sale of wall mounted HVAC units (the "wall mounted HVAC unit market").

**ANSWER:**

The allegations contained within this paragraph are incomprehensible and Bard therefore denies the same.  Bard stands on the record of the Crispaire litigation and denies any assertion which mischaracterizes that record.

35.     Such wall mounted units are used on telecommunication buildings, portable classroom buildings and other one-room structures throughout the United States.  These mounted units are uniquely designed to provide heating and/or air conditioning in these portable structures while at the same time providing ventilation in the structure, often by the use of an economizer. The wall mounted units have particular advantages to customers because they are cost effective and can be hung on the outside of the building, thereby maximizing interior space in the structure and allowing easy access for servicing.

**ANSWER:**

Bard generally admits the allegations contained within this paragraph, denying that Defendant has listed all possible applications of these units; Bard is without knowledge or information sufficient to form a belief as to relative terms such as "unique" or "often," or to what "[t]hese portable structures" is meant to refer, and therefore denies allegations encompassing the same.

36.     The United States is a relevant geographic market in which to assess the effects of Bard's anti-competitive behavior and anti-competitive acts with respect to the wall mounted HVAC units.

**ANSWER:**

Denied.

37.     In the Crispaire litigation, Bard admitted that its share of the wall mounted HVAC unit market was no less than 56% on average between 1994 and 1996 and, today, is even higher.

**ANSWER:**

Denied.

### *The Eubank Litigation*

38.     In 2000, Bard filed this patent infringement action to enforce the '744 Patent and the '878 Patent against Eubank even though it knew that its patent infringement lawsuit was objectively baseless when filed because its patents were fraudulently obtained, invalid and/or unenforceable.

**ANSWER:**

Bard admits that it filed this patent infringement action to enforce the '744 Patent and the '878 Patent against Defendant; Bard denies the remaining allegations contained within this paragraph.

39.     After a reasonable opportunity for further investigation or discovery, Eubank believes there will be evidence that Bard brought the patent infringement lawsuit against Eubank with full knowledge of the willful fraud it used to obtain the '744 patent and the '878 Patent.

**ANSWER:**

Denied.

## COUNT I

### (Declaration of Invalidity and Unenforceability of the '744 Patent)

40.     Eubank incorporates Counterclaim paragraphs 1 through 39 by reference as if fully set forth herein.

**ANSWER:**

Bard repeats paragraphs 1-39 of its Answer as if fully set forth herein.

41.     The '744 Patent is invalid and, therefore, unenforceable pursuant to 35 U.S.C. § 102(a) because the Sun AVE unit was known and used by others in the United States before it was allegedly invented by Irvin L. Derks.

**ANSWER:**

Denied.

42.     The '744 Patent is invalid and, therefore, unenforceable pursuant to 35 U.S.C. § 102(b) because the Sun AVE unit was offered for sale and sold in the United States more than one year prior to February 5, 1993, the filing date of the '744 Patent.

**ANSWER:**

Denied.

43.     The '744 Patent is invalid and, therefore, unenforceable pursuant to 35 U.S.C. § 102(f) and/or (g) because Irvin L. Derks was not the original, first and sole inventor of the invention disclosed in the '744 Patent.

**ANSWER:**

Denied.

44.    The '744 Patent is invalid and, therefore, unenforceable pursuant to 35 U.S.C. § 102(f) because Irvin L. Derks, derived the subject matter of the '744 patent from another, or at least derived so much of the claimed invention from another as would have rendered the invention obvious to one of ordinary skill in the art.

**ANSWER:**

Denied.

45.    The '744 Patent is invalid and, therefore, unenforceable pursuant to 35 U.S.C. § 103(a) because the subject matter of the '744 Patent as a whole would have been obvious to one of ordinary skill in the art in light of the Sun AVE unit.

**ANSWER:**

Denied.

## COUNT II

### (Declaration of Invalidity and Unenforceability of the '878 Patent)

46.    Eubank incorporates Counterclaim paragraphs 1 through 45 by reference as if fully set forth herein.

**ANSWER:**

Bard repeats paragraphs 1-45 of its Answer as if fully set forth herein.

47.    The '878 Patent is invalid and, therefore, unenforceable pursuant to 35 U.S.C. § 102(a) because the Sun AVE unit was known and used by others in the United States before it was allegedly invented by Irvin L. Derks.

**ANSWER:**

Denied.

48.     The '878 Patent is invalid and, therefore, unenforceable pursuant to 35 U.S.C. § 102(b) because the Sun AVE unit was offered for sale and sold in the United States more than one year prior to February 5, 1993, the priority date of the '878 Patent.

**ANSWER:**

Denied.

49.     The '878 Patent is invalid and, therefore, unenforceable pursuant to 35 U.S.C. § 102(f) and/or (g) because Irvin L. Derks was not the original, first and sole inventor of the invention disclosed in the '878 Patent.

**ANSWER:**

Denied.

50.     The '878 Patent is invalid and, therefore, unenforceable pursuant to 35 U.S.C. § 102(f) because Irvin L. Derks, derived the subject matter of the '878 patent from another, or at least derived so much of the claimed invention from another as would have rendered the invention obvious to one of ordinary skill in the art.

**ANSWER:**

Denied.

51.     The '878 Patent is invalid and, therefore, unenforceable pursuant to 35 U.S.C. § 103(a) because the subject matter of the '878 Patent as a whole would have been obvious to one of ordinary skill in the art in light of the Sun AVE unit.

**ANSWER:**

Denied.

## COUNT III

**(Declaration of Unenforceability of the '744 Patent and the '878 Patent Because of Inequitable Conduct in the United States Patent and Trademark Office)**

52.     Eubank incorporates Counterclaim paragraphs 1 through 51 by reference as if fully set forth herein.

**ANSWER:**

Bard repeats paragraphs 1-51 of its Answer as if fully set forth herein.

53.     As described more fully *supra*, Bard knew about the Sun AVE unit more than one year prior to February 5, 1993, the filing date of the '744 Patent and the priority date of the '878 Patent, and withheld this information intentionally from the United States Patent and Trademark Office with the intent to deceive the United States Patent and Trademark Office.

**ANSWER:**

Denied.

54.     Furthermore, after a reasonable opportunity for further investigation or discovery, Eubank believes there will be evidence that Bard knew that (a) certain employees at Sun conceived the invention and reduced it to practice before Irvin L. Derks conceived the invention and reduced it to practice and/or (b) that Irvin L. Derks derived the invention from information provided by James and/or Richard Bard after they examined the Sun AVE unit in September of 1991.

**ANSWER:**

Denied.

55.     The duty to disclose all known information that is material to patentability extends to each individual associated with the filing and prosecution of the patent application under 37 C.F.R. §1.56.  Those associated with the filing and prosecution of the '744 Patent and the '878 Patent include the alleged inventor, Irvin L. Derks, each attorney or agent who prepared or prosecuted the applications, and every other individual who was substantively involved in the prosecution of the patent applications (collectively, "those individuals associated with the patent applications").

**ANSWER:**

The above assertions are legal, not factual propositions, and are denied to the extent they misstate and misrepresent the applicable law.

56.     The Sun AVE unit was more pertinent than any other prior art cited to or by the United States Patent and Trademark Office.  It was material to the prosecution of the '744 Patent and the '878 Patent.  The Sun AVE unit was not cumulative of the art before the Examiner during the prosecution of either the '744 Patent or the '878 Patent.

**ANSWER:**

Denied.

57.     Correct inventorship of the subject matter of a patent application is a requirement that is material to the examination of the patent application.

**ANSWER:**

The above assertions are legal, not factual propositions, and are denied to the extent they misstate and misrepresent the applicable law.

58.     Bard, acting through those individuals associated with the patent applications, failed to notify the United States Patent and Trademark Office of the Sun AVE unit and/or of the

correct inventors of the subject matter of the patent application, and, therefore, Bard engaged in inequitable conduct and/or willful fraud, before the United States Patent and Trademark Office.

**ANSWER:**

Denied.

59.     Bard, acting through those individuals associated with the patent applications, failed to notify the United States Patent and Trademark Office of the Sun AVE unit and/or of the correct inventors of the subject matter of the patent application, and, therefore, Bard violated 37 C.F.R. § 1.56, the duty to disclose information material to patentability.

**ANSWER:**

Denied.

60.     After a reasonable opportunity for further investigation or discovery, Eubank believes there will be evidence that Bard, acting through those individuals associated with the patent applications, acted in bad faith in intentionally failing to notify and disclose to the United States Patent and Trademark Office the Sun AVE unit and/or of the correct inventors of the subject matter of the patent application, and, therefore, Bard violated 37 C.F.R. § 1.56, the duty to disclose information material to patentability.

**ANSWER:**

Denied.

**COUNT IV**

**(Monopolization and Attempted Monopolization in Violation of Sherman Act § 2)**

61.     Eubank incorporates Counterclaim paragraphs 1 through 60 by reference as if fully set forth herein.

**ANSWER:**

Bard repeats paragraphs 1-60 of its Answer as if fully set forth herein.

62.     During the prosecution of the patent application that matured into the '744 Patent, Bard knowingly and intentionally, with the intent to deceive and defraud the United States Patent and Trademark Office, failed to disclose (a) invalidating prior art to the United States Patent and Trademark Office, including the Sun AVE unit and (b) the correct inventors of the subject matter of the patent application.  The foregoing information was material to the application, and, but for Bard's intentional, fraudulent omissions and material misrepresentations, the '744 Patent would not have issued.

**ANSWER:**

Denied.

63.     Similarly, during the prosecution of the application that matured into the '878 Patent, Bard knowingly and intentionally, with the intent to deceive and defraud the United States Patent and Trademark Office, failed to disclose (a) invalidating prior art to the United States Patent and Trademark Office, including the Sun AVE unit and (b) the correct inventors of the subject matter of the patent application.  The foregoing information was material to the application, and, but for Bard's intentional, fraudulent omissions and material misrepresentations, the '878 Patent would not have issued.

**ANSWER:**

Denied.

64.     Bard, with full knowledge that the '744 Patent and the '878 Patent are invalid because they were procured by fraud on the United States Patent and Trademark Office, have deliberately impeded, and continue to deliberately impede, the efforts of Eubank to manufacture

and sell its wall mounted HVAC units by, *inter alia*, (a) bringing and maintaining this baseless action against Eubank, and (b) publicizing its lawsuits to actual and potential customers of Eubank, which will likely be supported after a reasonable opportunity for further investigation or discovery.  Bard has engaged in these actions to monopolize, and has monopolized, the wall mounted HVAC unit market, and it has done so for the purpose of eliminating Eubank from competing in this market.

**ANSWER:**

Denied.

65.     Alternatively, Bard engaged in these actions with the specific intent to monopolize the wall mounted HVAC unit market, and it has done so for the purpose of eliminating Eubank from competing in this market.  Bard's conduct posed, and continues to pose, a dangerous probability that such monopolization will succeed.

**ANSWER:**

Denied.

66.     Bard's conduct constitutes unlawful monopolization of, or an unlawful attempt to monopolize, the wall mounted HVAC unit market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**ANSWER:**

Denied.

67.     Bard's fraudulent actions and inactions, as alleged above, led to the false conclusion that the '744 Patent and the '878 Patent were valid, when they were not valid at all.

**ANSWER:**

Denied.

68.     Bard's actions in (a) procuring the '744 Patent and the '878 Patent by fraud; (b) filing and maintaining this baseless infringement action against Eubank; (c) publicizing its lawsuits to actual and potential customers of Eubank, which will likely be supported after a reasonable opportunity for further investigation or discovery; and (d) causing Eubank to incur unnecessary and substantial legal fees have adversely affected Eubank's position in the marketplace by making it more difficult for Eubank to compete.  By these actions, Bard has injured Eubank in its business and property, causing it to incur expenditures in the defense of Bard's infringement suit and to suffer economic losses in the market.

**ANSWER:**

Denied.

## COUNT V

### (Sham Litigation in Violation of Sherman Act § 2)

69.     Eubank incorporates Counterclaim paragraphs 1 through 68 by reference as if fully set forth herein.

**ANSWER:**

Bard repeats paragraphs 1-68 of its Answer as if fully set forth herein.

70.     Even if Bard's conduct before the United States Patent and Trademark Office did not rise to the level of actual fraud, it nonetheless constituted inequitable conduct, which Bard knew rendered the '744 Patent and the '878 Patent invalid and/or unenforceable.  Despite such knowledge, Bard brought and has maintained this suit against Eubank.

**ANSWER:**

Denied.

71.     In bringing and maintaining this suit, Bard knew that the '744 Patent and the '878 Patent are invalid and/or unenforceable for the reasons set forth, *supra*.  As such, Bard's patent infringement suit against Eubank is (a) objectively baseless in the sense that no reasonable litigant could realistically expect to win on the merits, and (b) subjectively baseless because it was not brought, nor is it being prosecuted, out of a desire to obtain a justifiable legal remedy. Instead, Bard instituted and/or maintained this lawsuit for the purpose of monopolizing the market for wall mounted HVAC units in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and to eliminate Eubank from competing in that market.

**ANSWER:**

Denied.

72.     Alternatively, Bard engaged in these actions with the specific intent to monopolize the wall mounted HVAC unit market and for the purpose of eliminating Eubank from that market; and its conduct posed (and continues to pose) a dangerous probability that such monopolization will succeed.

**ANSWER:**

Denied.

73.     Bard's conduct constitutes unlawful monopolization of, or an unlawful attempt to monopolize, the wall mounted HVAC unit market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**ANSWER:**

Denied.

74.     Bard's actions in (a) filing and/or maintaining this baseless infringement action and (b) publicizing it to actual and potential customers, which will likely be supported after a

reasonable opportunity for further investigation or discovery, have adversely affected Eubank's competitive position in the marketplace.  By these actions, Bard has injured Eubank in its business and property, causing it to incur large expenditures in the defense of Bard's infringement suit and to suffer economic losses in the market.

**ANSWER:**

Denied.

**COUNT VI**

**(Unfair Competition under Ohio State Law by Filing Sham Lawsuit)**

75.     Eubank incorporates Counterclaim paragraphs 1 through 74 by reference as if fully set forth herein.

**ANSWER:**

Bard repeats paragraphs 1-74 of its Answer as if fully set forth herein.

76.     As described fully above, Bard brought suit against Eubank alleging that certain of Eubank's products infringe the '744 Patent and the '878 Patent.  After a reasonable opportunity for further investigation or discovery, Eubank believes there will be evidence that this lawsuit was not founded upon good faith, but rather was brought with the intent and purpose of harassing and injuring Eubank.  Eubank is Bard's competitor in the relevant market as both companies produce and sell wall mounted HVAC units.

**ANSWER:**

Bard admits that it brought suit against Eubank for its infringement of the '744 Patent and the '878 Patent, and that Eubank is a competitor; Bard denies the remaining allegations contained within this paragraph.

77.     Bard's persistent and continuous litigation tactics in pursuing this objectively baseless lawsuit have resulted in damage to Eubank in the production and sale of its wall mounted units and has caused Eubank to expend funds to defend against this lawsuit.

**ANSWER:**

Denied.

78.     Furthermore, after a reasonable opportunity for further investigation or discovery, Eubank believes there will be evidence that Bard has acted fraudulently and in bad faith in pursuing this baseless suit by asserting the '744 Patent and the '878 Patent, both of which it knows to be invalid and/or unenforceable.

**ANSWER:**

Denied.

### AFFIRMATIVE DEFENSES

Further answering, Bard states that:

1.     Eubank's Counterclaims each fail to state a claim upon which relief may be granted.

2.     The '744 Patent was obtained through proper and satisfactory compliance with the provisions of the Patent Act, 35 U.S.C. §§ 1 *et seq*., and corresponding Regulations, 37 CFR §§ 1.1 *et seq*.

3.     The '878 Patent was obtained through proper and satisfactory compliance with the provisions of the Patent Act, 35 U.S.C. §§ 1 *et seq*., and corresponding Regulations, 37 CFR §§ 1.1 *et seq*.

4.     The '744 Patent and the '878 Patent are valid and enforceable.

5.      Bard is immune from any antitrust liability alleged to be predicated on the filing of this or any other lawsuit.  Bard's actions and conduct are protected activities.

6.      Bard denies any act alleged in the Counterclaims, or otherwise, violated §2 of the Sherman Act or any other sections of the antitrust laws of the United States.

7.      Bard's actions and conduct do not constitute anticompetitive activity.

Wherefore, Bard respectfully requests that the Court dismiss Eubank's Counterclaims in their entirety and deny Eubank any relief, and that the relief sought by Bard in its Complaint be granted.

Respectfully submitted,

March 13, 2001

s/ Timothy M. Morella
Michael H. Baniak
Christina L. Brown
Timothy M. Morella
BANIAK PINE & GANNON
150 N. Wacker Drive, Suite 1200
Chicago, Illinois  60606-1606
(312) 673-0360  (Voice)
(312) 673-0361  (Facsimile)

Attorneys for Plaintiff
BARD MANUFACTURING CO.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 13, 2001, a copy of the foregoing Answer to Counterclaim was electronically filed with the United States District Court for the Northern District of Ohio. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.


<u>s/ Timothy M. Morella</u>
Attorney for Plaintiff,
BARD MANUFACTURING CO.