IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

BARD MANUFACTURING CO.,

                  Plaintiff,          Case No. 3:00 CV 7711

-vs-

                                      MEMORANDUM OPINION

EUBANK MANUFACTURING
ENTERPRISES, INC.,

                  Defendant.

KATZ, J.

This matter is before the Court on the parties' cross-motions for patent claim construction (Doc. Nos. 43 & 45) and Defendant's motion for leave to file an additional counterclaim (Doc. No. 57). This Court has jurisdiction pursuant to 28 U.S.C. § 1338. For the following reasons, leave to amend will be denied.

### BACKGROUND

*I. Claim Interpretation*

Plaintiff Bard Manufacturing Co. ("Bard") brought this action against Defendant Eubank Manufacturing Enterprises, Inc. ("Eubank") for infringement of two patents held by Bard, U.S. Patent Nos. 5,301,744 and 5,485,878 (the "'744 patent" and the "'878 patent" or the "Bard patents"). Both

parties manufacture air conditioners, and that is the subject of the patents. Because this decision addresses only patent claim construction and not the possibility of infringement, there is no need for a detailed factual exposition.

Although neither party claims to know what patent claims of the Bard patents are at issue in this suit, their briefs interpret or discuss the interpretation of Claims 1, 17, and 21 of the '744 patent and Claims 1, 19, and 25 of the '878 patent. Because the disputed claims of patent '878 are almost identical to the disputed claims of patent '744, the claims as set forth below are those contained in the '744 patent, with the changes in the '878 patent enclosed in brackets and the specifically disputed portions of the claims in boldface:

Claim 1 [1]:
1. An [In a heating, ventilation and] air conditioning [(HVAC)] system attachable to a structure, said structure having an interior and an exterior, said air conditioning system comprising:
a) an elongate housing including;
    1)     a module receiving chamber inside said housing in communication externally and internally of said housing;
    2)     a return air opening in said housing in communication with said chamber and with said interior;
    3)     an air inlet opening in said housing in communication with said chamber and with said exterior;
    4)     **an air exhaust duct in said housing in communication with said chamber** and with said exterior for exhausting air from said interior to said exterior;
    5)     an air supply duct in said housing having a first end in communication with said chamber and a second end in communication with said interior to provide a conduit for passage of conditioned air from said ventilation system to said interior;
    6)     a ventilation module **removably fastenable within said chamber**, said ventilation module containing a damper for routing air through said return air opening, said air inlet opening, said air supply duct, and said air exhaust duct;
    7)     means for conditioning air within said air supply duct;

        8)    means for circulating air mounted in said air supply duct for drawing fresh air through said air inlet opening and said return air opening, though said chamber, through said air conditioning means, and out said second end of said air supply duct into said interior;

b) means for controlling said air circulating means and said conditioning air means, said control means receiving and processing signals from a thermostat located in said structure or in said return air opening [temperature responsive means]; and

c) means for connecting said thermostat with said control means [means for circulating air mounted in said air supply duct for drawing fresh air through said air inlet opening and said return air opening, through said chamber, through said air conditioning means, and out said second end of said air supply duct into said interior].

Claim 17 [19]:

17.    An air conditioning [In an HVAC] system attachable to a structure having an interior and an exterior, said ventilation system [air conditioning system] comprising:

a)    a housing including:
- 1) a receiving chamber in communication externally and internally of said housing,
- 2) a return air opening in communication with said receiving chamber and said interior;
- 3) an air inlet opening in communication with said receiving chamber and said exterior;
- 4) **an air exhaust duct in communication with said receiving chamber** and said exterior for exhausting air from said interior to said exterior;
- 5) an air supply duct having a first end in communication with said receiving chamber and a second end in communication with said interior, said air supply duct including a means for conditioning air and a means for circulating air which draws air through said air inlet opening, said return air opening, said receiving chamber, said conditioning air means and said second end of said air supply duct to said interior,
- 6) an interchangeable ventilation module **removably fastened within said receiving chamber** having a damper for routing air through said return air opening, said inlet air opening, said air supply duct and said air exhaust duct; and

b)    a [means] thermostatic control responsive to a temperature variation within said structure for controlling said air circulating means and said air conditioning means.

Claim 21 [25]:

21. A method for ventilating a structure, said structure [with a HVAC system] having an interior and an exterior, comprising:

3

a) providing an elongate housing including:
  1) a module receiving chamber inside said housing in communication externally and internally of said housing;
  2) a return air opening in said housing in communication with said chamber and with said interior;
  3) an air inlet opening in said housing in communication with said chamber and [with] said exterior;
  4) **an air exhaust duct in said housing in communication with said chamber** and with said exterior for exhausting air from said interior to said exterior; and
  5) an air supply duct in said housing having a first end in communication with said chamber and a second end in communication with said interior to provide a conduit for passage of conditioned air from said ventilation system to said interior;
b) **fastening a removable ventilation module within said chamber**, said ventilation module containing a damper for routing air through said return air opening, said air inlet opening, said air supply duct, and said air exhaust duct;
c) drawing air into said ventilation [HVAC] system by a means for circulating air through said air inlet opening and said return air opening, through said chamber, and into said air supply duct;
d) conditioning said air within said air supply duct by heating, cooling, dehumidifying [filtering] and filtering as desired;
e) circulating said conditioned air through said second end of said air supply duct and into said interior of said structure;
f) controlling said air circulating means and said conditioning air means in response to signals received by a thermostat [by utilizing a means responsive to temperature, said temperature responsive means] located in said structure; and
g) connecting said thermostat [temperature responsive means] with a means for controlling control means.

## II. Addition of a Counterclaim

In addition to its motion for claim interpretation, Eubank has filed a motion for leave to amend its counterclaim to include a "false marking" action under 35 U.S.C. § 292. Bard has opposed this motion on the grounds that it is untimely, prejudicial, and futile.

4

**DISCUSSION**

*I. Claim Interpretation*

    *A. Claim Interpretation Standard*

The meaning of patent claim terminology is a matter of law for the court, not an issue of fact for the jury. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd* 517 U.S. 370, 116 S. Ct. 1384. Claim construction is a way to elaborate the language contained in the claims so that they may be understood and explained; it is not a way to change the scope of the claims. *See Scripps Clinic & Research Found. v. Genetech, Inc.*, 927 F.2d 1565, 1580 (Fed. Cir. 1991). The Court should consult three sources of intrinsic evidence when determining the meaning of the claims: the prosecution history, the patent specification, and the claims themselves. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The Court is also permitted to use extrinsic evidence, but only when the intrinsic evidence will not resolve the dispute. *See id.* at 1583. A dictionary is a special type of extrinsic evidence that may be consulted together with the intrinsic evidence so long as it does not contradict the intrinsic evidence. *See id.* at 1584 n.6. Although the claims must be interpreted in light of the specifications, the features in the specifications should not necessarily be read into the claims, *see Sjolund v. Musland*, 847 F.2d 1573, 1581 (Fed. Cir. 1988), and the claims should not be limited by the preferred embodiments listed in the specification. *See SRI Int'l v. Matsushita Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985).

    *B. Eubank's Proposed Claim Interpretation*

Eubank has proposed the following claim interpretation:

5

1. The terms "fastenable"; "fastened"; and "fastening" mean the ventilation module is attached within the ventilation chamber with screws.
2. The terms "removably" and "removable" mean capable of being removed.
3. The term "within said chamber" means that the ventilation module is located entirely inside of the ventilation chamber, with no external hood or damper.
4. The term "an air exhaust duct *in communication with* said chamber" means that there is an unobstructed exhaust opening in the bottom of the ventilation chamber that connects the ventilation chamber and the air exhaust duct.

*C. Bard's Proposed Claim Interpretation*

Bard has proposed this claim interpretation:

The phrases "removably fastenable within" [in the Bard patents] and "removably fastened within" [in the Bard patents] mean that a ventilation module (such as an economizer, for example only) is designed with and effective for the intended purpose of being installed within and also removed from the wall-mounted HVAC unit simply and easily, and no particular type of device or mechanism is required to so locate the ventilation module within the chamber.

Bard does not suggest a claim interpretation with respect to an external hood or an unobstructed exhaust opening.

*D. Interpretation of Claims*

1. The Fasteners

Eubank argues that any fastening must be done by screws, since they are the only mode of attachment mentioned in the specifications. Bard maintains that no screws are necessary, and notes, as an example, that a module that is placed in a chamber that is covered by a panel that has been secured over the chamber is just as "fastened" as a screwed module.

The *Oxford English Dictionary Online* (2d Ed. 1989), at http://dictionary.oed.com, defines neither "removably" nor "fastenable." There are a number of definitions for "fastened," the most relevant being "fixed or bolted together." "Fasten," which is not used in the patent, is most relevantly defined as

6

"To make fast to something else; to attach, more or less securely, by a tie or bond *of any kind*." *Id.* (emphasis added).

"Removable" is defined as "capable of being removed." *Id.* "Remove" is defined as "To move or shift from or out of the place occupied; to lift or push aside; to lift up and take away; to take off." *Id.*

Given these definitions and having reviewed the Bard patents, the Court is convinced that the proper claim interpretation lies between the interpretations provided by the parties. First, there is no need to limit "fastenable" to the use of screws. Clearly, if Bard had wanted to require that the modules be "fastened by screws," it could have stated that in the claims, or used the word "screwable," which is also in the OED. There is nothing in the claims to lead one to believe that other implements, such as velcro, wingnuts, magnets, or cable ties would not serve as well as screws, and there is no reason to read such a limitation into the claims.

Bard's claim interpretation is not entirely correct, however. Given the definition of "fasten" stated above and as set forth in the specifications, Bard's use of the term "fastenable" in the claims does not support an argument that a module can be secured by placing an access panel over the place where the module is inserted, without more. Furthermore, Bard claims that "removable" implies that the ventilation module may be taken away from the unit "quickly and easily," and argues that all things are removable when the proper amount of force is used. Given the information in the specifications, "removable" and "removably" more likely mean that the ventilation module may be detached and taken away from the unit without damage to or destruction of the unit or the module.

2. The Hood

7

Eubank argues that "within said chamber" means the ventilation module must be located entirely within the chamber, without an external hood or damper. Bard contends that the claims do not speak to the existence of a hood, and that the requirement that a hood not be attached to the ventilation module should not be read into the claims. The summary portion of the patents states, "The modules are installed within the air conditioning system thus eliminating the need for unsightly hoods or damper assemblies on the exterior of the air conditioning system." Bard argues that this statement should not be read out of context, and that it only used this statement to distinguish the patent from prior art not relevant to this suit.

The Court finds that Eubank's interpretation is correct. Although Bard did not specifically mention external hoods in its claims, the statement in the specifications is a disclaimer of the use of interchangeable ventilation modules that have hoods. *See SciMed Life Sys. v. Advanced Cardiovascular Sys.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001).

3. The Air Exhaust Duct

Eubank argues that the phrase "an air exhaust duct in communication with said chamber" requires an unobstructed exhaust opening. Bard claims that the words mean just what they say, and that there is therefore no need for further claim interpretation.

Nothing in the claims or specifications states that the exhaust opening must be "unobstructed," even if that is a preferred embodiment in the specifications. Unlike the requirement that there not be a hood, nothing in the Bard patents disclaims obstruction. Further, Bard appears correct in its assertion that Eubank's insertion of the term "unobstructed" would probably invite needless argument over how much a flow of air must be restricted before it may be considered "obstructed."

E. *Final Claim Interpretation*

8

Based on the above interpretations, the Court adopts the following claim construction:

1. The terms "fastened," "fastenable," and "fastening" mean the ventilation module is secured within the ventilation chamber through the use of a tie or bond of any kind that is directly applied to the module.
2. The terms "removable" and "removably" mean that the ventilation module may be extracted from the ventilation chamber through the release of the tie or bond used to secure the ventilation module in the chamber, without damage to the unit.
3. The phrase "within said chamber" means the ventilation module must be located entirely within the ventilation chamber, with no external hood or damper.
4. The phrase "an air exhaust duct in communication with said chamber" means that the air exhaust duct and the relevant chamber share an opening that allows the passage of air.

II. *Eubank's Motion to Add Counterclaim*

    A. *Standard for Amendment of Counterclaim*

Eubank has moved that it be allowed to amend its counterclaim pursuant to Rule 15 of the Federal Rules of Civil Procedure. The policy permitting amendment is a liberal one, and such "leave shall be freely given when justice so requires." FED. R. CIV. P. 15(a); *see also General Elec. Co. v. Sargent & Lundy*, 916 F.2d 1119, 1130 (6th Cir. 1990).

The United States Supreme Court has outlined situations where amendment might not be appropriate:

> In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of the amendment, etc. – the leave sought should, as the rules require, be "freely given." Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court. . . .

*Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L. Ed. 2d 222 (1962).

    B. *The Proposed Amendment*

9

Eubank has requested leave to file a *qui tam* counterclaim based on Bard's alleged false marking of products in violation of 35 U.S.C. § 292. Eubank claims that at the October 18, 2001, Rule 30(b)(6) deposition of Bard, it discovered that Bard had been marking two products with the patents at issue in this case, even though those products allegedly were not covered by the patents. Eubank also claims that some units were incorrectly marked "patent pending." Violations of Section 292 are punishable by a penalty of up to $500 for each violation.

According to Bard, the two units that Eubank claims were mismarked are shipped with attachments that obstruct the air exhaust opening. Bard explains that these attachments are added only after the units have been marked with the patents at issue, and that prior to the addition of the attachments they comply with the patents.

Bard argues that the counterclaim is untimely, because Eubank has known since 1994 how Bard units are marked. Bard also claims that the counterclaim would delay trial due to extensive new discovery, and that it would prejudice Bard because Eubank allowed damages to accumulate before bringing suit. Bard further argues that the counterclaim is futile, since there is no "intent to deceive" as required by the statute. Finally, Bard claims that the counterclaim was brought only to harass and delay, and asks (in its response, without formal motion) that the Court grant it fees and costs incurred as a result of Eubank's motion.

The Court agrees that allowing amendment at this late date in the litigation process would impose additional discovery responsibilities and significantly delay the resolution of this case. While this Court does not promote duplicative litigation, it is too late in this action for amendment to add an entirely new cause of action that is not necessary to dispose of the issues currently before the Court. Leave to amend

will be denied. Because there has been no determination that the proposed counterclaim is futile or frivolous, the Court will not grant Bard its costs and fees.

## CONCLUSION

For the foregoing reasons, Eubank's motion for leave to amend (Doc. No. 57) will be denied. The Court having considered the parties requests for claim interpretation (Doc. Nos. 43 & 45), the claims of the '744 and '878 patents will be construed as set forth in Section I(E), *supra*.

IT IS SO ORDERED.

                                                 s/ *David A. Katz*
                                                DAVID A. KATZ
                                                U. S. DISTRICT JUDGE